**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**CHRISTOPHER JOHN GAGE**                    **CIVIL ACTION**

**versus**                                                        **NO. 12-1054**

**N. BURL CAIN, WARDEN**                          **SECTION: "I" (1)**

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Christopher John Gage, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana. On January 21, 2000, he was convicted of one count of

second degree murder, two counts of manslaughter, and one count of attempted manslaughter.[1]  On March 10, 2000, he was sentenced as follows:  life imprisonment without benefit of probation, parole, or suspension of sentence on the conviction for second degree murder; forty years imprisonment on each conviction for manslaughter; and twenty years on the conviction for attempted manslaughter.  It was ordered that those sentences run consecutively.[2]

On direct appeal, the Louisiana First Circuit Court of Appeal affirmed petitioner's convictions and sentences only conditionally.  Finding that the trial court erred by failing to resolve the issue of petitioner's competency prior to trial, the Court of Appeal remanded the matter to the state district court to determine whether a *nunc pro tunc* competency hearing was possible.  The Court of Appeal ruled that if the state district court found that petitioner had been incompetent at the time of trial, or if it found that the inquiry into competency was now impossible, he was entitled to a new trial.  However, if the  state district court found that the inquiry was possible and further found that he had been competent at the time of trial, his right to appeal was reserved.[3]  Petitioner's related writ application challenging that judgment was denied by the Louisiana Supreme Court on September 13, 2002.[4]

---

[1] State Rec., Vol. I of VI, minute entry dated January 21, 2000; State Rec., Vol. I of VI, jury verdict form.

[2] State Rec., Vol. II of VI, sentencing transcript dated March 10, 2000; State Rec., Vol. I of VI, minute entry dated March 10, 2000.

[3] State v. Mathews, 809 So.2d 1002 (La. App. 1st Cir. 2001) (No. 2000 KA 2115).

[4] State v. Matthews, 824 So.2d 1191 (La. 2002) (No. 2001-K-2873).

On remand, the state district court found that petitioner had been in fact been competent at trial and denied a new trial.[5]  On October 29, 2010, the Louisiana First Circuit Court of Appeal found no error with respect to that ruling and then unconditionally affirmed petitioner's convictions and sentences.[6]  Without assigning additional reasons, the Louisiana Supreme Court denied petitioner's related writ application on April 25, 2011.[7]

On April 25, 2012, petitioner, through counsel, filed the instant federal application for *habeas corpus* relief.[8]  The state concedes that the federal application is timely and that petitioner has exhausted his remedies in the state courts.[9]

## I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas

---

[5]  State Rec., Vol. I of VI, Order dated January 29, 2009; State Rec., Vol. I of VI, Reasons dated January 29, 2009.

[6]  State v. Gage, No. 2010 KA 0237, 2010 WL 4273080 (La. App. 1st Cir. Oct. 29, 2010); State Rec., Vol. III of VI.

[7]  State v. Gage, 62 So.3d 86 (La. 2011) (No. 2010-KO-2666); State Rec., Vol. III of VI.

[8]  Rec. Doc. 1.

[9]  Rec. Doc. 6, pp. 6-7.

'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law or mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme

> Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

<u>Wooten v. Thaler</u>, 598 F.3d 215, 218 (5th Cir.) (internal quotation marks, ellipses, brackets, and footnotes omitted), <u>cert. denied</u>, 131 S.Ct. 294 (2010).

Regarding the "unreasonable application" clause, the United States Supreme Court has explained:

> [A] state-court decision can involve an "unreasonable application" of this Court's clearly established precedent in two ways. First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

<u>Williams v. Taylor</u>, 529 U.S. 362, 407 (2000). The Supreme Court has noted that the focus of this inquiry "is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in <u>Williams</u> that an unreasonable application is different from an incorrect one." <u>Bell</u>, 535 U.S. at 694; <u>see also</u> <u>Puckett v. Epps</u>, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."), <u>cert. denied</u>, 132 S.Ct. 1537 (2012).

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court recently held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 131 S.Ct. 770, 786-87 (2011) (citations omitted; emphasis added).

## II. Facts

The facts of the underlying crimes are not relevant to the claims asserted in this federal application, and, therefore, they need not be recounted herein. However, the Court notes that they are summarized in State v. Mathews, 809 So.2d 1002, 1007-08 (La. App. 1st Cir. 2001).

## III. Petitioner's Claims

In this federal proceeding, petitioner claims that trial court erred in finding that a *nunc pro tunc* determination of competency was possible and in finding that petitioner had in fact been competent to stand trial.

The United States Fifth Circuit Court of Appeals has explained:

> The State violates a defendant's constitutional right to due process if he is tried while legally incompetent. The State must maintain adequate procedures to insure the defendant's right to be tried while competent. Failure to observe procedures to protect a

defendant's right not to be tried or convicted while incompetent deprives him of his due process right to a fair trial. If the trial judge received information which objectively considered, should reasonably have raised a doubt about defendant's competency and alerted him to the possibility that the defendant could neither understand the proceedings, nor rationally aid his attorney in his defense, the trial judge must make further inquiry into the defendant's competence to stand trial. If the trial judge does not conduct an inquiry into competency after receiving sufficient information to raise a reasonable doubt as to competency, a procedural due process violation ... occurs.

Wheat v. Thigpin, 793 F.2d 621, 629 (5th Cir. 1986) (citations, quotation marks, and brackets omitted). In those cases in which a competency hearing was required but not held prior to trial, the resulting constitutional error can be corrected by holding a *nunc pro tunc* hearing "if there is sufficient evidence available reasonably to ensure that a reliable determination of competency can be made." Id.

In the first direct appeal in the instant case, the Louisiana First Circuit Court of Appeal found that the trial court erred in failing to hold a competency hearing and remanded the case for a determination of whether the error could be remedied by a *nunc pro tunc* hearing. The Court of Appeal held:

Gage asserts that the trial court erred in allowing the case to proceed to trial after a sanity commission had been invoked, because a hearing as to his competency was never held. ...

Gage initially pled "not guilty and not guilty by reason of insanity" under docket numbers 316,719 and 316,720 on October 1, 1998, in the court of Judge Edward Gaidry, Division A. On October 20, 1998, Gage, through his appointed counsel, filed a "Motion for Psychiatric Examination" in both cases. This motion requested that the defendant be examined by psychiatrists to determine his competence to stand trial and his mental capacity to commit the crime on December 15, 1997. The following day, Judge Gaidry signed an order appointing two doctors to examine Gage. This order was

signed only for docket number 316,720, the indictment which charged Gage with attempted first-degree murder. The order in docket number 316,719, the indictment which charged Gage with three counts of first-degree murder, was never signed by the trial judge.

On March 15, 1999, all of the cases involving these murders were re-allotted to Judge John Walker, Division B. On June 2, 1999, a new attorney for Gage filed a motion to withdraw the insanity plea. In his motion to withdraw the insanity plea, Gage's counsel stated:

> The defense has obtained sufficient examination of your mover at this time by qualified medical expert to believe that the burden of proof of an insanity defense cannot be maintained at trial and hence the motion to withdraw same is proper.

Judge Walker signed the motion, and allowed Gage to withdraw his plea of not guilty by reason of insanity. The motion was filed only in docket number 316,719 (three counts of first-degree murder), where a sanity commission had not been appointed. The motion was not filed in docket number 316,720 (one count of attempted first-degree murder).

Gage was re-arraigned on the amended indictment on September 27, 1999. At the arraignment hearing, Gage pled not guilty to all charges. His attorney and the trial judge discussed his previous insanity plea. Gage's new counsel told the court that the motion for psychiatric examination was never signed by Judge Gaidry and explained to the court that Judge Gaidry did not sign the motion, along with several other pre-trial motions, pending the outcome of a sanity hearing. Thereafter, Judge Walker stated:

> It is also my understanding that with respect to Mr. Gage, there was an original sanity plea which was subsequently withdrawn. I don't know why Judge Gaidry didn't sign motions. I suspect that he didn't sign any motions while there was a pending sanity plea because it interrupted proceedings, and that may have been his reason why. I don't know, and so I'm not sure about that.

At this same hearing, Gage was re-arraigned under docket number 303,250 with three counts of second-degree murder and one

count of attempted second-degree murder. He did not object to the re-arraignment nor did he request any further psychiatric examinations.

On appeal, Gage now urges that all proceedings occurring after Judge Gaidry signed the one order to appoint a sanity commission should be nullified. In the alternative, he urges that he is entitled to an evidentiary hearing to determine his competency.

The defendant cites State v. Carney, 25-518 (La.App. 2d Cir. 10/13/95), 663 So.2d 470, and State v. Guidry, 449 So.2d 41 (La.App. 1st Cir. 1984). He asserts that although the ordering of a sanity commission to inquire into his capacity to proceed rests in the sound discretion of the trial court, once the commission is ordered, "it takes on a life of its own ...." Carney, 25-518 at p. 5, 663 So.2d at 473. Nothing further can happen without resolving the issue of his mental capacity, including the changing of a plea. Carney, 25-518 at p. 5, 663 So.2d at 473.

The state cites State v. Barnett, 96-2050 (La.App. 1 Cir. 9/23/97), 700 So.2d 1005, and State v. Gowan, 96-0488 (La. 3/29/96), 670 So.2d 1222, in support of its position that the defendant has implicitly waived his right to a sanity commission. In these cases, the trial judge had not made the threshold determination that a sanity commission should be appointed before the defendant changed his plea of insanity.

Louisiana Code Crim. P. art. 650 provides that a sanity commission is not required every time a defendant pleads "not guilty and not guilty by reason of insanity". Rather, it is left to the sound discretion of the trial judge to determine if there is reasonable ground to doubt the defendant's capacity to proceed. "When the question of the defendant's mental incapacity to proceed is raised, ... no further steps in the criminal prosecution, except the institution of prosecution," may be brought "until the defendant is found to have the mental capacity to proceed." La.Code Crim. P. art. 642. However, a defendant can waive his right to have a motion for a sanity commission heard or decided by failing to pursue the right before entering a plea of not guilty. See State v. Gowan, 96-0488 at p. 1, 670 So.2d at 1222; State v. Barnett, 96-2050 at pp. 15-16, 700 So.2d at 1014-15.

Judge Gaidry made a determination that a sanity commission should be appointed. Apparently, the signed "Motion for Psychiatric Examination" was overlooked by the state, the trial court, and Gage's new attorney. However, after the motion was signed and the sanity commission ordered, no further steps in the prosecution of Gage

should have been taken until the issue of defendant's competency had been decided. See La.Code Crim. P. art. 642, et seq.; State v. Nomey, 613 So.2d 157 (La. 1993).

The failure to resolve the issue of a defendant's capacity to proceed may result in nullification of the conviction and sentence. Nomey, 613 So.2d at 161-62. However, an exception to immediate nullification has been recognized by the Louisiana Supreme Court. See State v. Snyder, 98-1078, pp. 29-31 (La. 4/14/99), 750 So.2d 832, 854-55; Nomey, 613 So.2d at 161 & n. 8-162. A nunc pro tunc hearing on the issue of competency is appropriate "if a meaningful inquiry into the defendant's competency can still be had." Snyder, 98-1078 at p. 29, 750 So.2d at 854. "The trial court is in the best position to determine whether it can make a retrospective determination of defendant's competency during his trial and sentencing." Snyder, 98-1078 at pp. 30-31, 750 So.2d at 855. "The state bears the burden to show the court that the tools of rational decision are available." Snyder, 98-1078 at p. 31, 750 So.2d at 855. Whether a meaningful retroactive competency hearing can be held must be decided on a case by case basis, with Snyder, Nomey, and the cases cited within, as guidance. Snyder, 98-1078 at p. 31, 750 So.2d at 855.

Therefore, we conditionally affirm the convictions and sentences of defendant Gage, and remand to the trial court for the purpose of determining whether a nunc pro tunc competency hearing may be possible. If the trial court believes that it is still possible to determine the defendant's competency at the time of the trial on the charges, the trial court is directed to hold an evidentiary hearing. If the defendant was competent, no new trial is required. If the defendant is found to have been incompetent at the time of trial, or if the inquiry into competency is found to be impossible, defendant Gage is entitled to a new trial. Snyder, 98-1078 at pp. 31-32 & 43, 750 So.2d at 855-56 & 863. Defendant's right to appeal is reserved. Snyder, 98-1078 at p. 43, 750 So.2d at 863.[10]

On remand, the state district court then held an evidentiary hearing and determined both that a *nunc pro tunc* competency hearing was proper under the facts of this case and that the petitioner had in fact been competent to stand to trial. The trial judge ruled:

---

[10] State v. Mathews, 809 So.2d 1002, 1014-16 (La. App. 1st Cir. 2001) (No. 2000 KA 2115).

Defendants Christopher Gage, Gary Matthews, and Leonard Pharagood were originally indicted for three (3) counts of first-degree murder and one count of attempted first-degree murder in docket No. 316,720 of the 32nd Judicial District. Attorneys Robert Pastor and Mark Nolting represented the defendant. This case was originally allotted to Division "A" where various pleadings were filed and hearings held. Division "A" transferred the case to Division "B" which tried the case of all three (3) defendants.

On September 27, 1999, the State filed an amended indictment, in docket No. 303,250, and charged all three (3) defendants with three (3) counts of second-degree murder and attempted second-degree murder. Trial was held on January 11-21, 2000.

After transfer of the case to Division "B," defense counsel requested funds for the purpose of conducting psychiatric examination of the defendant. On April 12, 1999, this Court signed an *ex parte* order, in Docket No. 316,720, to allow the expenditure of four thousand five hundred dollars ($4,500) to have defendant examined by Dr. Sara Deland, a forensic psychiatrist, Dr. Marc Zimmerman, a forensic psychologist, and Patricia Percy, a forensic social worker.

On June 2, 1999, in Docket No. 316,719, defense counsel, Mark Nolting, filed a motion to withdraw insanity plea stating "the defense has attained sufficient examination of your mover at this time by qualified medical expert(s) to believe that the burden of proof of an insanity defense cannot be maintained at trial, and, hence, the motion to withdraw same is <u>proper</u>." The Court signed the written motion to allow the withdrawal of the previous insanity plea on same date, June 2, 1999.

Prior to trial, defendant and defense counsel, Mark Nolting, made multiple court appearances in connection with the proceedings herein. At no time was there a "hint" or mention of the necessity for the Court to hold any hearings concerning defendant's mental state or his ability to assist counsel.

On September 27, 1999, an amended indictment, No. 303,250, was filed charging all defendants with three (3) counts of second-degree murder and one count of attempted second-degree murder.

On September 27, 1999, defendant Christopher Gage entered a "<u>NOT GUILTY PLEA</u>" on the <u>new</u> charges. There was no mention of any issues concerning competency or the ability to assist counsel. <u>THERE WAS NO RESERVATION OF RIGHTS WHATSOEVER</u>

(emphasis supplied).  Defendant did not renew the original insanity plea.

On December 1, 1999, defense counsel for "Gage" filed a written notice of intention to present an alibi defense herein alleging defendant was visiting with a friend, Zondrea Jupiter, at McDonald's, her place of employment.  This motion and its contents are clear evidence of defendant's ability to assist counsel.

On December 15, 1999, discovery motions and a motion to suppress were held with all defendants and defense counsel present.  Trial was held January 11-21, 2000.  Defendant was convicted of second-degree murder, attempted second degree murder [sic], manslaughter, and attempted manslaughter.  There was no motion to continue the trial so that mental examinations could be completed.

At no time prior to trial, during trial, or during post-trial motions was the issue of defendant's mental competency or ability to assist counsel raised after the June 2, 1999, withdrawal of the insanity plea.  At no time did defense counsel inform the Court of any difficulties with defendant in assisting counsel with his defense.

The Court observed the defendant and defense counsel and their interaction with the other defendants and defense counsel during the various proceedings.  No one questioned defendant's mental competency or ability to assist counsel, nor was there any testimony adduced by witnesses to this effect.  No family member, attorney, codefendant, or interested party came forward on these issues.  The Court did not observe any behavior which would cause a person to question the defendant's mental status or ability to assist counsel.  During the course of trial, security issues arose causing extra security measures to be taken to insure defendants did not disrupt the trial proceedings.  The Court did not observe childish behavior such as giggling, laughing, disruptive verbal remarks, or disruptive conduct by defendant with the other codefendants.

It was the defendant's own motion by his own attorney to remove the competency issue from the trial proceedings.  The Court granted Gage's attorney funds to conduct requested competency examinations by the personnel listed in the defendant's own motion.  The court was justified in its belief that defense counsel had made an informed decision as a result of their own expert examinations of defendant.

When defense counsel withdrew the insanity plea and stated that they had obtained sufficient examination of defendant by medical experts and that the withdrawal of the insanity plea was <u>proper</u> (emphasis supplied), this was a judicial admission of the defendant's

competency and ability to assist counsel. Also, the entry of the not guilty plea on the amended indictment waived the defendant's issues of competency and ability to assist counsel.

This case is easily distinguished from other *nunc pro tunc* cases. This is not a situation where defendant was not examined by any doctors. Defendant had the benefit of being examined by his own experts chosen by defense counsel instead of Court-appointed doctors. Based on those examinations, defense counsel admitted that defendant was competent and able to assist counsel.

Based on the records, pleadings, and evidence which was available when defendant went to trial, the Court finds Christopher Gage to have been competent without the necessity of considering the additional evidence adduced at the *nunc pro tunc* hearing.

### NUNC PRO TUNC HEARING

The presentation of testimony and evidence for the *nunc pro tunc* hearing was completed December 6, 2005. The case was left open for the presentation of memoranda by the State and defense and oral argument prior to the Court's ruling.

At the outset, a number of legal issues arose which resulted in the filing of writs by defense counsel. The Court of Appeals and Supreme Court denied writs which upheld the rulings of the Trial Court concerning the admissibility of evidence and burden of proof herein.

Legal issues which arose included the following: which party would bear the burden of proof; inspection and discovery of the defense files to determine if the defense possessed information relevant to the defendant's mental condition which would not be protected by the attorney-client privilege; whether the defendant's lawyers could be called to testify as witnesses; and the discovery of the notes or medical reports of Dr. Sara Deland.

Defendant's attorneys, Robert Pastor and Mark Nolting, testified. Pastor was not counsel of record at defendant's trial but was co-counsel with Nolting during the pendency of the original first-degree murder charge.

Pastor testified about his inability to communicate with Gage and his concern that Gage did not appreciate the gravity of the charges pending against him. After the indictment was amended to second-degree murder, Pastor did not divulge these issues to the Court. Apparently, he did not relay same to Mr. Nolting whose testimony was contrary to that of Pastor.

Prior to this trial, the Court had regular dealings with Pastor and Nolting on other cases. It was common for both to work on murder cases on behalf of the Indigent Defender Board. It was common practice for both Pastor and Nolting to be assigned the defense of a first-degree murder case. It was also common for one attorney to be relieved of the appointment for representation once the case was no longer a death penalty case.

Nolting testified that he did not feel the defendant's competency was at issue. If so, he would have withdrawn the not guilty plea if there was evidence of a mental defect. He further testified he was fully aware that no other proceedings could be handled if there was a pending competency hearing. Obviously, Nolting was of the legal opinion that the withdrawal of the sanity plea and entry of the not guilty plea on the second-degree murder dispensed with the necessity of the previously requested mental examination.

Nolting's testimony confirms the statements made in the motion to withdraw the insanity plea and that defendant was competent to stand trial.

Nolting further testified that defendant provided names of the alibi witnesses and recalled discussions with defendant about his whereabouts at the time of the crimes charged. As a result of information provided, Nolting filed a notice of alibi on behalf of defendant in his defense. Obviously, Gage was able to assist counsel.

Dr. Sara Deland testified she interviewed Gage and evaluated his mental competency. Defendant was able to provide information concerning his family history, childhood, drug history, psychiatric and medical history. Gage was able to relate to Dr. Deland the pending charges and their details. Gage understood the concept of alibi, and the difference in a not guilty plea and not guilty by reason of insanity. Gage was pleasant, cooperative, and answered with accurate answers. Dr. Deland had no questions about Gage's competency. Jail records show Dr. Deland met with defendant and defense counsel at the Terrebonne Parish Criminal Justice Complex prior to trial. There were no examinations after trial.

Sergeant Mitch Dupre is the records custodian at the Terrebonne Parish Criminal Justice Complex (TPCJC) where Gage was incarcerated. A review of the visitor logs showed that Gage was visited at the jail by Robert Pastor, Mark Nolting, and other non-lawyers. These records also showed that Dr. Sara Deland visited with Gage on October 7, 1998; May 12, 1999; and September 2, 1999.

Employees at the TPCJC, where the defendant was incarcerated, also testified as to their observations of the defendant.

Deputy David Perio is the recreational officer. He testified that he observed Gage at recreation, but did not observe any problems, and seemed to converse normally.

Richard "Peetie" Neal is the medical examiner at TPCJC where he maintained medical records for the jail. A review of those records shows that Gage was not transported to any other medical facility for treatment.

Kellie Smith was a licensed practical nurse who delivered medication to the inmates at TPCJC. She observed Gage when she delivered medications for colds. She recalled Gage was able to communicate and did tell her his medical needs.

Considering the totality of all evidence, especially that of Dr. Sara Deland, who examined the defendant prior to trial, the defendant's trial counsel, Mark Nolting, who withdrew a prior insanity plea and communicated with the defendant on his defense, it is clear that defendant, Christopher Gage, was mentally competent and able to assist counsel.[11]

In the related appeal, the Louisiana First Circuit Court of Appeal held that the state district court did not err in finding that a *nunc pro tunc* determination of competency was possible in this case. The Court of Appeal stated:

> [T]he defendant argues that the trial court erred in finding a *nunc pro tunc* competency hearing was possible, because the record, together with such additional evidence as may be relevant and available, did not permit an accurate assessment of the defendant's condition at the time of the original proceeding.
>
> *Nunc pro tunc* hearings on the issue of competency are allowed if a meaningful inquiry into the defendant's competency can still be had. The trial court is in the best position to determine whether it can make a retrospective determination of the defendant's competency during his trial and sentencing. The determination of whether a trial court can hold a meaningful retrospective competency hearing is necessarily decided on a case-by-case basis. The State bears the burden to show the court that the tools of rational decision

---

[11] State Rec., Vol. I of VI, Reasons dated January 29, 2009.

are available. <u>State v. Snyder</u>, 98-1078, pp. 30-31 (La. 4/14/99), 750 So.2d 832, 855.

A "meaningful" determination is possible when the state of the record, together with such additional evidence as may be relevant and available, permits an accurate assessment of the defendant's condition at the time of the original State proceeding. Additionally, when determining whether a meaningful hearing may be held, we look to the existence of contemporaneous medical evidence, the recollections of non-experts who had the opportunity to interact with the defendant during the relevant period, statements by the defendant in the trial transcript, and the existence of medical records. The passage of time is not an insurmountable obstacle if sufficient contemporaneous information is available. <u>State v. Snyder</u>, 98-1078 at p. 31, 750 So.2d at 855.

The detailed written reasons for judgment filed in this matter demonstrate that the trial court did not abuse its discretion in finding that a meaningful retrospective competency hearing was possible. The reasons further reveal that contemporaneous medical evidence and/or medical records were available.

In these reasons, the trial judge indicated that although the defendant was originally charged in Division "A" of the trial court, "where various pleadings were filed and hearings held," his case was transferred to Division "B." The State then amended the indictment on December 27, 1999, to charge the defendant, along with two co-defendants, under Docket Number 303,250. The trial resulting in the defendant's conviction was held January 11-21, 2000.

The trial judge further noted in his reasons that, after transfer of the case to Division "B," defense counsel requested funds for conducting psychiatric examination of the defendant and, on April 12, 1999, the court ordered the expenditure of $4,500 to have the defendant examined by Dr. Sarah Deland, a forensic psychiatrist, Dr. Marc Zimmerman, a forensic psychologist, and Patricia Percy, a forensic social worker.[FN3] However, according to the trial judge's reasons, on June 2, 1999, defense counsel Mark Nolting filed a motion to withdraw the defendant's insanity plea stating, "the defense has attained sufficient examination of your mover at this time by qualified medical expert(s) to believe that the burden of proof of an insanity defense cannot be maintained at trial, and, hence, the motion to withdraw same is <u>proper</u>." (Emphasis original.)

> [FN3] The record indicates that only Dr. Deland examined the defendant.

The defendant argues that insanity at the time of the offense and competency to proceed to trial are two different things. We agree. We note, however, that an expert determining the defendant's sanity at the time of the offense would be in a position to note the defendant's competency to proceed to trial. The trial court's reasons for judgment also indicate that recollections of non-experts who had the opportunity to interact with the defendant during the relevant period and the court's own recollection of the defendant's behavior at trial were available.[FN4]

> [FN4] Defendant's competency to proceed to trial is addressed hereinafter in connection with his third assignment of error.

This assignment of error is without merit.[12]

The Court of Appeal then also held that the state district court did not err in finding that petitioner had in fact been competent to stand trial. The Court of Appeal stated:

> In his third assignment of error, the defendant argues the trial court erred in finding he had the mental capacity to proceed to trial, because members of his defense team (Robert Pastor, Mark Nolting, and Victoria Monteiro) indicated he lacked orientation as to time and space, failed to participate in preparing a defense, and was disruptive during trial.
>
> Robert Pastor testified at the *nunc pro tunc* competency hearing. He was appointed to represent the defendant when the defendant was charged with three counts of first degree murder. Pastor related that, at that time, the defendant was preoccupied with other matters and he was unable to impress upon the defendant the meaning of first degree murder and the consequences of a conviction on that charge. Pastor also stated that the defendant was unable to provide him with enough information to look for possible witnesses to subpoena on behalf of the defendant. Pastor had no contact with the defendant after the first degree murder charges against him were reduced.

___

[12] State v. Gage, No. 2010 KA 0237, 2010 WL 4273080, at *1-3 (La. App. 1st Cir. Oct. 29, 2010); State Rec., Vol. III of VI.

Mark Nolting also testified at the *nunc pro tunc* competency hearing. Nolting was appointed as the penalty phase attorney for the defendant when he faced first degree murder charges, and he continued as the trial attorney when the charges were reduced. Nolting testified that the defendant, "didn't appear to be orientated to time and space as far as, you know, where he was at a certain time. Particularly, if you get arrested, sometime [sic] after an event, you don't necessarily know where you were." Nolting indicated, however, that the defendant gave him several names of people he knew and saw on a daily basis. Nolting also testified, "I think and I kind of very vaguely remember that there may have been some incidences during the trial where the [d]efendant got kind of hyperventilated and may have made brash statements on the [r]ecord, I don't know." Nolting conceded that "competency can change," and sometimes a defendant's ability to communicate with his attorney can improve once he is in jail and off drugs or alcohol. When asked if during the preparation of the case for trial, and specifically during the week of trial, he felt there was a need for competency tests to be performed on the defendant, Nolting replied, "If I had, I would have had them done."

Victoria E. Monteiro also testified at the *nunc pro tunc* competency hearing. She was a licensed investigator and had assisted the defense in connection with the defendant's case. She indicated the defendant was very vague and she "didn't think" he understood her or Pastor. She further related that the defendant was unable to tell her the facts relating to the case. Nevertheless, Ms. Monteiro disclosed that she was at the counsel table during trial and did not witness any incidents that would have delayed the trial, any outbursts, or any other inappropriate behavior by the defendant.

Dr. Sarah Deland also testified at the *nunc pro tunc* competency hearing. She was hired by Pastor to determine whether or not there were any mental health issues that would be pertinent for the sentencing phase. She indicated her normal procedure for an examination was to conduct an interview, perform a mental status examination, look at any records provided, and prepare an assessment of competency.

Dr. Deland did not have any independent recollection of interviewing the defendant. She did, however, have pages of notes concerning the interview. Dr. Deland testified that she visited the defendant in jail on May 12, 1999, and that he was able to provide her with his arrest date at that time. The defendant was further able to tell Dr. Deland that he was a single, twenty-year-old black male,

that he was born on June 2, 1978 in Charity Hospital in New Orleans, and that he was raised in Thibodaux. He also told her that his father had died in January of 1999, at age sixty-five, after suffering two strokes. The defendant also provided Dr. Deland with the name, age, and address of his mother, and the names and ages of his brothers and sisters. Dr. Deland asked the defendant how he would describe his childhood, and he indicated that he had a fairly happy childhood. The defendant also advised Dr. Deland of his educational history, his criminal history, and that he was twelve years old at the time of his first sexual encounter. The defendant also reported that his mother had taken him "for psych," which Dr. Deland interpreted as psychological testing, because the defendant stated he had to repeat first grade and because he had been psychologically tested at a juvenile detention facility.

The defendant advised Dr. Deland that he was charged with three counts of first degree murder and one count of attempted first degree murder in Thibodaux. He indicated to Dr. Deland that the newspaper said it was a "drug deal that went bad." Dr. Deland asked the defendant to explain the meaning of first degree murder, and he replied that murder meant that "you meant to kill somebody," and that "if it were first degree that you could get death or a life sentence." Dr. Deland asked the defendant to explain the meaning of attempt, and he said that it "means you try, you tried to kill them."

The defendant also told Dr. Deland that his attorney was Robert Pastor and that he had been appointed to represent the defendant. Dr. Deland asked the defendant if he knew how to contact his attorney, and the defendant stated that he had Pastor's phone number. Dr. Deland asked the defendant what his attorney's job was, and he replied, "To defend me – to try to get me off." Dr. Deland's notes also indicated the defendant understood his right to have an attorney and his right to remain silent. Her notes also stated that the defendant understood the concept of alibi.

Dr. Deland asked the defendant what the D.A.'s job was, and he responded, "To prosecute me ... they want to get a conviction." Dr. Deland asked the defendant what the jury's job was, and he answered that "they see if you are guilty or not guilty." Her notes also recorded that she advised the defendant that, in a first degree murder case, the jury would also decide whether a defendant would receive the death penalty. Dr. Deland asked the defendant what the judge's job was, and he replied that "he's the boss." Dr. Deland asked the defendant about the function of witnesses, and he stated that "witnesses tell what happened." Dr. Deland asked the defendant

about audience participation during trial, and he told her that "the audience can't say anything." Dr. Deland asked the defendant about the defendant's role at trial, and he answered that a defendant is "not supposed to say anything, that the lawyer talks for you." Dr. Deland's notes indicated the defendant also understood that if a witness lied or said something the defendant did not agree with, he could whisper to his attorney during court.

Dr. Deland asked the defendant to explain the meaning of a not guilty plea, and he said that it meant that "he didn't do it." Dr. Deland asked the defendant, "What happens then?" He replied that you "[h]ave a trial." Dr. Deland asked the defendant, "If you are found not guilty at the trial, what happens?" He replied, "You could go home." She also asked the defendant to explain the meaning of being found guilty, and he said that "[g]uilty means you did it." She asked, "And what would happen?" The defendant replied, "You would get time." Dr. Deland asked the defendant if there were any other ways you could plead and he "brought up no contest." Dr. Deland asked if the defendant had ever heard of not guilty by reason of insanity or the insanity plea. The defendant responded that it meant that "you did it, but you didn't know what you were doing." Dr. Deland then asked what he thought the judge would do with somebody in that case, and the defendant said, "[S]end them to the hospital." Dr. Deland's notes also indicated the defendant understood that plea bargaining involved "making a deal," and meant that a defendant would get less time, the district attorney would get a conviction, and that, to plea bargain, a defendant has to plead guilty.

Dr. Deland did not remember having any concerns about what the defendant remembered about the offense or what he could tell his lawyer, but indicated she had not gone into those subjects with the defendant. She further testified that she did not use any standardized tests on the defendant. She also did not specifically discuss with the defendant his right to choose to testify or to remain silent in the courtroom, though she noted the defendant said he should let his lawyer talk for him. Dr. Deland conceded that she had thought about some of the elements considered in a competency hearing, but stated that she did not perform a thorough competency examination of the defendant. Dr. Deland was then asked, "How comfortable are you right now to say that [you] remember now that Christopher Gage was competent not now but was competent six years ago?" She replied, "I couldn't tell you. I couldn't tell you."

The trial court found that even without considering the evidence adduced at the *nunc pro tunc* hearing, "the record, pleadings, and evidence which [were] available when defendant went to trial" indicated the defendant was competent at the time of trial. The court noted that prior to trial, the defendant and defense counsel Nolting made multiple appearances in connection with the proceedings and "[a]t no time was there a 'hint' or mention of the necessity for the Court to hold any hearings concerning [the] defendant's mental state or his ability to assist counsel." The court also noted that on December 1, 1999, counsel for the defendant filed a written notice of intention to present an alibi defense, alleging that the defendant was visiting his friend, Zondrea Jupiter, at McDonald's, her place of employment. The court found the notice of alibi was clear evidence of the defendant's ability to assist counsel. The court noted there was no motion to continue the trial so that mental examinations could be completed and, "[a]t no time prior to trial, during trial, or during post-trial motions was the issue of defendant's mental competency or ability to assist counsel raised after the June 2, 1999, withdrawal of the insanity plea."

The trial court also noted that it observed the defendant and defense counsel and their interaction with the other defendants and defense counsel during the various proceedings. The court stated that during trial, it had not observed childish behavior, such as giggling, laughing, disruptive verbal remarks, or disruptive conduct by the defendant with the codefendants. The defendant disputes the findings of the trial court, arguing the trial transcript indicates he made a "gun" with his finger during trial. We addressed this issue in our original decision in this matter, noting:

> The one incident referred to by Gage's appellate counsel involved Gage making gestures to a witness, including the gesture of pointing a gun. The record reflects that the [S]tate expressed concern at trial that Gage was attempting to intimidate the witness. This incident suggests a knowledge of the proceedings and the possible consequences of a conviction. Alone, it is insufficient to prove or suggest mental incapacity.

State v. Mathews, 2000-2115 at pp. 17-18, 809 So.2d at 1016-17.

The trial court did not err in finding that the defendant had the mental capacity to proceed to trial. This assignment of error is without merit.[13]

Without assigning additional reasons, the Louisiana Supreme Court then denied petitioner's related writ application.[14]

In his federal *habeas corpus* application, petitioner argues both that the *nunc pro tunc* hearing was improper and that the state courts erred in concluding that he had in fact been competent to stand trial.

As to the former issue, the undersigned finds that, under the facts of the instant case, the *nunc pro tunc* competency hearing was proper. As the United States Fifth Circuit Court of Appeal has explained:

> Both the Supreme Court and this circuit are acutely aware of the hazards connected with retrospective competency hearings. A concurrent determination is indisputably the preferred method for insuring an accurate assessment of defendant's mental status. Nevertheless, this court has repeatedly sanctioned nunc pro tunc proceedings where there is sufficient data available to guarantee reliability.
> Understandably, hard and fast rules in this area have not been formulated. Like the determination of competency itself, the question of meaningfulness can be answered only by a full review of the facts of each case, taking into account the quality and quantity of available data as well as the opinion of experts.
> Although clearly relevant, the time factor is not determinative. The passage of even a considerable amount of time may not be an insurmountable obstacle if there is sufficient evidence in the record derived from knowledge contemporaneous to trial. Especially when defendant's mental state was at issue, the transcript of the trial itself

---

[13] Gage, 2010 WL 4273080, at *4-8; State Rec., Vol. III of VI.

[14] State v. Gage, 62 So.3d 86 (La. 2011) (No. 2010-KO-2666); State Rec., Vol. III of VI.

may provide a solid starting point for reliable reconstruction of the pertinent facts. Mental examinations conducted close to the trial date, of course, increase the probability that the nunc pro tunc hearing will not be unduly speculative. Likewise, the recollections of non-experts (including the observations of the trial judge) who had the opportunity to interact with defendant during the relevant period may in some instances provide a sufficient base upon which a factfinder may rest his decision that even a belated determination will be accurate.

United States v. Makris, 535 F.2d 899, 904-05 (5th Cir. 1976) (citations omitted). Similarly, the United States Tenth Circuit Court of Appeals has explained:

Although retrospective competency hearings are disfavored, they are permissible whenever a court can conduct a meaningful hearing to evaluate retrospectively the competency of the defendant. A "meaningful" determination is possible where the state of the record, together with such additional evidence as may be relevant and available, permits an accurate assessment of the defendant's condition at the time of the original state proceedings. A court should consider (1) the passage of time, (2) the availability of contemporaneous medical evidence, including medical records and prior competency determinations, (3) any statements by the defendant in the trial record, and (4) the availability of individuals and trial witnesses, both experts and non-experts, who were in a position to interact with defendant before and during trial, including the trial judge, counsel for both the government and defendant, and jail officials.

Clayton v. Gibson, 199 F.3d 1162, 1169 (10th Cir. 1999) (citations and quotation marks omitted). Further, the Fifth Circuit has noted: "The meaningfulness determination is a threshold legal inquiry which is not measured against the same scale as the later ruling on the merits. It is the existence of contemporaneous data (both medical and lay), not the experts' interpretation of that data, which is the critical element at this stage of the inquiry." Bruce v. Estelle, 536 F.2d 1051, 1057 (5th Cir. 1976). In making that determination, a court looks to whether "the quantity and quality of available

evidence [is] adequate to arrive at an assessment that could be labeled as more than mere speculation." Id.

In the instant case, the undersigned is given pause by the significant of amount of time which passed between petitioner's trial and the *nunc pro tunc* competency hearing over five years later. However, as noted, that factor is not determinative where there is sufficient evidence available to ensure that a reliable determination of competency can be made. Here, such evidence was abundant. First, there were the records and evidence of Dr. Deland concerning her contemporaneous examination of plaintiff's mental condition. Second, numerous witnesses who interacted with petitioner were available to testify concerning their impressions of his mental status and demeanor at the time of trial, including an assistant district attorney (Bradley Allen Doyle), defense counsel (Robert Pastor or Mark Nolting), an investigator for the Indigent Defender Board (Victoria Monteiro), and a jail deputy (David Perio). Third, the judge at the *nunc pro tunc* hearing was the same judge who presided at trial and was able to recall his own impressions of the events. In light of these facts, the undersigned finds that petitioner has failed to establish that state courts' decision that a *nunc pro tunc* determination of competency was possible in this case was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

The undersigned further finds that the state courts properly concluded that petitioner had in fact been competent to stand trial. In determining whether a defendant is competent to stand trial, a court looks to "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual

understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402 (1960).

However, as the United States Eleventh Circuit Court of Appeals has explained:

> Competency is contextual. A criminal defendant represented by counsel generally has limited responsibilities in conducting his defense: primarily, recognizing and relating relevant information to counsel and making the few trial-related decisions reserved for defendants (i.e., whether to plead guilty, whether to request a jury trial, whether to be present at trial, and whether to testify). The defendant need not participate in the bulk of trial decisions, which he may leave entirely to counsel (how to select jurors, which witnesses to call, whether and how to conduct cross-examination, what motions to make, and similar tactical decisions).

Watts v. Singletary, 87 F.3d 1282, 1288-89 (11th Cir. 1996) (footnotes omitted).

In the instant case, the evidence at the *nunc pro tunc* hearing was sufficient to establish that petitioner had in fact been competent to stand trial. Like the state courts, the undersigned finds it particularly telling that defense counsel never once raised the issue of competency after withdrawing the insanity plea. See id. at 1288 ("[F]ailure of defense counsel to raise the competency issue at trial, while not dispositive, is evidence that the defendant's competency was not really in doubt ...."). Even more convincing is the testimony of Dr. Deland concerning her contemporaneous examination of petitioner. This evidence, along with the trial judge's recollection of the events, serve as a sufficient basis to support the state courts' reasonable determination that petitioner was competent. Therefore, applying the AEDPA's deferential standards, this Court finds that petitioner's claim should be rejected.

Lastly, out of an abundance of caution, the Court notes that petitioner's counsel mentions in passing that the state court erred in compelling the defense "to produce materials from its file" and in compelling counsel and defense experts to testify on matters relating to petitioner's

competency in the *nunc pro tunc* hearing.[15]  It does not appear that this passing reference is intended as a separate constitutional claim, in that it is made without any argument or elaboration whatsoever and with no citation to federal law.  Nevertheless, even if it is intended as a distinct claim, it should be rejected for the following reasons.

In the second direct appeal, the Louisiana First Circuit Court of Appeal explained:

[T]he defendant argues the trial court erred in denying the defense objection and allowing the State to obtain information from defense counsel and persons hired by the defense concerning the defendant's competency at the time of trial, which violated the attorney-client privilege.
Louisiana Code of Evidence Article 506(B) provides, in pertinent part:

A client has a privilege to refuse to disclose, and to prevent another person from disclosing, a confidential communication, whether oral, written, or otherwise, made for the purpose of facilitating the rendition of professional legal services to the client, as well as the perceptions, observations, and the like, of the mental, emotional, or physical condition of the client in connection with such a communication, when the communication is:

(1) Between the client or a representative of the client and the client's lawyer or a representative of the lawyer.

However, Comment (i) to Article 506 states that the privilege does not include any information that the lawyer may have gotten by reason of his being such legal adviser.
In determining the applicability of a privilege, a court should determine whether the testimony that is claimed to be privileged is in the class whose exclusion will advance the policy sought to be furthered by the privilege.  State v. Taylor, 94-0696, p. 6 (La. 9/6/94),

[15]  Rec. Doc. 1, p. 7.

642 So.2d 160, 165. The purpose of the attorney-client privilege is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the attorney being fully informed by the client. The privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out. See Upjohn Company v. United States, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981).

Following remand, the State moved for permission to issue a subpoena to the defense attorney of record at the time of trial and to issue a *subpoena duces tecum* for him to produce his file for *in camera* inspection, in order to extract information regarding the competency of the defendant at the time of trial. The defense stated the defendant did not waive any applicable privileges and asserted the attorney-client privilege as to all information, including any personal observations, office file notes, and communications with experts, with respect to the competency of the defendant. The court ruled that if a competency hearing with the State experts had been held, the report of Dr. Deland would have been admissible evidence and would have been discoverable by the State. The court reasoned that if the report would have been discoverable, it should not be privileged now. The court held all defense information that would reflect the mental status, competency, or the sanity of the defendant at the time the motions were filed until trial was not privileged and ordered the information produced for *in camera* inspection. Additionally, the court ordered that Dr. Deland prepare a written report concerning her observations, findings, and opinions concerning the competency and mental status of the defendant. The defense objected to the trial court's rulings.

Louisiana Code of Evidence Article 506(B) was not violated in this case. The privilege recognized in Article 506(B) protects against disclosure of "confidential communication[s]" and "the perceptions, observations, and the like, of the mental, emotional, or physical condition of the client in connection with such [communications]." A communication is "confidential" if it is not intended to be disclosed to persons other than: (a) those to whom disclosure is made in furtherance of obtaining or rendering professional legal services for the client; (b) those reasonably necessary for the transmission of the communication; and (c) when

special circumstances warrant, those who are present at the behest of the client and are reasonably necessary to facilitate the communication. LSA-C. E. art. 506(A)(5).

The trial court in this case ordered production of information concerning the competency and mental status of the defendant prior to trial. This information was not a confidential communication under LSA-C.E. art. 506(B) because, unlike information implicating the defendant in a crime, it was not disclosed in furtherance of obtaining legal services. The information ordered produced in this case included information concerning whether the defendant was fully aware of the nature of the proceedings, such as: whether he understood the nature of the charge and could appreciate its seriousness; whether he understood what defenses were available; whether he could distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he had an awareness of his legal rights; and whether he understood the range of possible verdicts and the consequences of conviction. It also included facts to determine the defendant's ability to assist in his defense, such as: whether he was able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he was able to assist counsel in locating and examining relevant witnesses; whether he was able to maintain a consistent defense; whether he was able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he had the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he was capable of testifying in his own defense; and to what extent, if any, his mental condition was apt to deteriorate under the stress of trial. See State v. Bennett, 345 So.2d 1129, 1138 (La. 1977) (on rehearing). Further, exclusion of information concerning the competency of the defendant prior to trial under the attorney-client privilege would not advance the policy sought to be furthered by that privilege, because the information did not relate to the client's reasons for seeking representation.

This assignment of error is without merit.[16]

---

[16] Gage, 2010 WL 4273080, at *3-4; State Rec., Vol. III of VI.

Without assigning additional reasons, the Louisiana Supreme Court then denied petitioner's related writ application.[17]

This Court need not, and does not, reach the issue of whether the state courts erred in finding that there was no violation of the attorney-client privilege. Federal *habeas corpus* relief may be granted only to remedy violations of the Constitution and laws of the United States. 28 U.S.C. § 2254; Engle v. Isaac, 456 U.S. 107, 119 (1983). The attorney-client privilege simply does not stem from the federal constitution. Lange v. Young, 869 F.2d 1008, 1012 n.2 (7th Cir. 1989). Accordingly, because a violation of the attorney-client privilege is not a federal constitutional violation, it cannot serve as a basis for federal *habeas corpus* relief. Id.; see also Dye v. Hofbauer, 197 Fed. App'x 378, 383 (6th Cir. 2006) ("The attorney-client privilege is a creation of common law, and a violation of this privilege generally does not constitute grounds for habeas relief."); Smith v. Moore, 137 F.3d 808, 819-20 (4th Cir. 1998) (same).

## RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Christopher John Gage be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from

---

[17] State v. Gage, 62 So.3d 86 (La. 2011) (No. 2010-KO-2666); State Rec., Vol. III of VI.

a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[18]

New Orleans, Louisiana, this eleventh day of June, 2012.

**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**

---

[18] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.